IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOE S. McCLENTON, #240601,       )
                                 )
            Plaintiff,            )
                                 )
      v.                          )          CASE NO. 2:11-cv-542-TMH
                                 )                   [WO]
                                 )
KIM THOMAS, *et al.*,             )
                                 )
            Defendants.           )

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Joe S. McClenton

("McClenton"), an indigent state inmate, challenging the response of medical personnel to an

issue with his defibrillator and the adequacy of treatment provided to him for a bilateral hernia

during his incarceration at the Bullock Correctional Facility ("Bullock").[1]  McClenton also

brings an Eighth Amendment claim asserting that all areas of Bullock are not accessible to him

as a wheelchair-bound inmate.  McClenton names Kim Thomas, Commissioner of the Alabama

Department of Corrections, Kenneth Jones, the warden of Bullock, Sylvester Nettles, a

correctional officer at Bullock, Correctional Medical Services, Inc. ("CMS"), Dr. Tahir Siddiq

and Nurse Emma Nalls, as defendants in this cause of action.  McClenton seeks declaratory

relief, monetary damages, and injunctive relief for the alleged violations of his constitutional

rights.

---

[1]A bilateral hernia occurs when a hernia develops on each side of the groin.

The defendants filed special reports and relevant supporting evidentiary materials, including affidavits and certified medical records, addressing McClenton's claims for relief. Pursuant to the orders entered in this case, the court deems it appropriate to construe the aforementioned reports as motions for summary judgment. *Order of September 1, 2011 - Doc. No. 21*. Thus, this case is now pending on the defendants' motions for summary judgment. Upon consideration of these motions, the evidentiary materials filed in support thereof and the plaintiff's responses, the court concludes that the defendants' motions for summary judgment are due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials

---

[2]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed. R. Civ. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*. Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing prior versions of the rule remain equally applicable to the current rule.

and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-24.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine dispute of material fact.  Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may . . . grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.").  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities [and medical personnel].  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530 (2006) (internal citation omitted).  Consequently, to survive

the defendants' properly supported motions for summary judgment, McClenton is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Fed. R. Civ. P. 56(e). "If the evidence [on which the nonmoving party relies] is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id*. at 249-50. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1576-77 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 242). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions . . . , in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment"); *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322

("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Sw. Forest Indus., Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Sec'y of the Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-24 (summary judgment appropriate where pleadings,

5

evidentiary materials and affidavits before the court show no genuine dispute as to a requisite material fact); *Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001) (to establish a genuine dispute of material fact, nonmoving party must produce evidence such that reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, McClenton fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment.

## III.  DISCUSSION[3]

### A.  Absolute Immunity - Correctional Defendants

To the extent McClenton sues defendants Thomas, Jones, and Nettles in their official capacities, they are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the state has

---

[3]Although in response to the defendants' special reports McClenton presented more specific claims and supporting facts with respect to his initial grounds for relief, this court limits its review to the allegations set forth in the complaint. *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment."); *Ganstine v. Sec'y, Fla. Dep't of Corr.*, 502 F. App'x 905, 909-10 (11th Cir. 2012) (plaintiff may not amend complaint at the summary judgment stage by raising a new claim or presenting a new basis for a pending claim); *Chavis v. Clayton Cnty. Sch. Dist.*, 300 F.3d 1288, 1291 n.4 (11th Cir. 2002) (court refused to address a new theory raised during summary judgment because the plaintiff had not properly amended the complaint).

waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S. Ct. 900, 908, 79 L. Ed. 2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S. Ct. 1114, 1125, 134 L. Ed. 2d 252 (1996).   Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.   Therefore, Alabama state officials are immune from claims brought against them in their official capacities."   *Lancaster v. Monroe Cnty.*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that defendants Thomas, Jones, and Nettles are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.   *Lancaster*, 116 F.3d at 1429; *Jackson v. Ga. Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994); *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### B.  Individual Capacity Claims Against the Correctional Defendants

1.  <u>Wheelchair Accessability</u>.  McClenton alleges that defendants Thomas, Jones, and Nettles subjected him to cruel and unusual punishment in violation of the Eighth Amendment because Bullock "is not in compliance with handicap standards."   *Compl. - Doc. No. 1* at 3.

The correctional defendants deny that the conditions at Bullock violated McClenton's constitutional rights protected by the Eighth Amendment.   In response to the allegation presented by McClenton regarding wheelchair access, defendant Jones avers that

> Bullock Correctional Facility is handicap accessible.  All areas that accommodate inmate traffic (Dormitories, Dining Hall, Hallways, Gymnasium, Chapel, etc.[)],

are located inside a building with a solid concrete floor and doorways wide enough to allow wheelchair passage. Five (5) dormitories at Bullock Correctional Facility have not only handicap accessibility, but have bathroom/shower areas with wheelchair accessibility and handrails for the showers and toilets. One (1) dormitory has a fold-down seat in the shower area to accommodate the physically impaired.

*Attachment 1 to the Supplemental Special Report of the Correctional Defendants (Exhibit 5) -*

*Doc. No. 35-1* at 1.

Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Eighth Amendment, therefore, proscribes those conditions of confinement which involve the wanton and unnecessary infliction of pain. *Id*. at 346. Only actions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to establish constitutional violations. *Id.* at 347. The Eighth Amendment is concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Id*. at 348 (citation omitted). Conditions which may be "restrictive and even harsh, [ ] are part of the penalty that criminal offenders pay for their offenses against society" and, therefore, do not necessarily constitute cruel and unusual punishment within the meaning of the Eighth Amendment. *Id*. "'[T]he Constitution does not mandate comfortable prisons.' If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.' Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.'" *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (internal citations omitted). Although the Constitution "does not mandate comfortable prisons . . . neither does it permit inhumane ones."

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Rhodes*, 452 U.S. at 349).  Thus, it is well-settled that the conditions under which a prisoner is confined are subject to constitutional scrutiny.  *Helling v. McKinney*, 509 U.S. 25 (1993).

A prison official has a duty under the Eight Amendment to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S. at 832  (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)); *Helling*, 509 U.S. at 31-32.  The challenged prison condition must be "extreme" and must pose "an unreasonable risk of serious damage to his future health." *Chandler v. Crosby*, 379 F.3d 1278, 1289-90 (11th Cir. 2004).  To demonstrate an Eighth Amendment violation regarding conditions of confinement, a prisoner must satisfy both an objective and a subjective inquiry.  *Farmer*, 511 U.S. at 834.  In *Farmer*, the Court identified both objective and subjective elements necessary to establish an Eighth Amendment violation.  With respect to the requisite objective elements, an inmate must first show "an objectively substantial risk of serious harm . . . exist[ed].  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner."  *Marsh*, 268 F.3d 1028-29.   As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  . . . ***[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be***

*condemned as the infliction of punishment*." *Farmer*, 511 U.S. at 837-38 (emphasis added);

*Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838)

("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell*

*v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve

more than ordinary lack of due care for the prisoner's interests or safety. . . .  It is *obduracy and*

*wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited

by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with

establishing conditions of confinement, supplying medical needs, or restoring official control

over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S. Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S. Ct. 2321, 2324-25, 115 L. Ed. 2d 271 (1991). . . .  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S. Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  "The known risk of injury must be

a strong likelihood, rather than a mere possibility before [the responsible official's] failure to act

can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990)

(citations and internal quotations omitted).  As the foregoing makes clear, "[m]erely negligent

failure to protect an inmate . . . does not justify liability under section 1983." *Id*.

McClenton challenges wheel chair accessibility at Bullock.  He fails to establish,

however, that the challenged conditions have caused him serious harm and it is clear from his

pleadings that he is able to access all areas of Bullock necessary to maintain his health and well being without suffering the requisite harm.  McClenton has also failed to produce evidence which shows that the correctional defendants ignored an obvious risk of serious harm to him of which they were aware and nevertheless disregarded, *Farmer* 511 U.S. at 837, or that the actions of the correctional defendants resulted in the denial of the minimal civilized measure of life's necessities.  *Rhodes*, 452 U.S. at 347.

In addition, McClenton's allegation of wheelchair inaccessibility at Bullock and his purely conclusory contention that this purported lack of access is inadequate, standing alone, do not establish an Eighth Amendment violation.  *See Rhodes*, 452 U.S. at 348.  Instead, McClenton must show that the conditions complained of deprived him of essential food, medical care, sanitation or other necessities.  *Id*.  His general allegation fails to make this showing and there is no indication or evidence that McClenton was deprived of access to facilities when needed or that the challenged conditions otherwise deprived him of basic needs, posed a risk to his health or subjected him to a substantial risk of serious harm, nor that correctional officials exhibited deliberate indifference to any known risk of harm.  *Farmer*, 511 U.S. at 834. The mere fact that some areas of Bullock may not accommodate a wheelchair is insufficient to demonstrate a constitutional violation and, without more, do not do so in this case.  Consequently, summary judgment on this claim is due to be granted in favor of defendants Thomas, Jones and Nettles.

2. Medical Treatment.  The claim made against defendants Thomas, Jones and Nettles challenging the constitutionality of treatment provided by medical professionals likewise entitles McClenton to no relief as

11

> [t]he law does not impose upon correctional officials a duty to
> directly supervise health care personnel, to set treatment policy for
> the medical staff or to intervene in treatment decisions where they
> have no actual knowledge that intervention is necessary to prevent
> a constitutional wrong.  *See Vinnedge v. Gibbs*, 550 F.2d 926 (4th
> Cir. 1977) (a medical treatment claim cannot be brought against
> managing officers of a prison absent allegations that they were
> personally connected with the alleged denial of treatment).
> Moreover, "supervisory [correctional] officials are entitled to rely
> on medical judgments made by medical professionals responsible
> for prisoner care.  *See, e.g.*, *Durmer v. O'Carroll*, 991 F.2d 64, 69
> (3d Cir. 1993); *White v. Farrier*, 849 F.2d 322, 327 (8th Cir.
> 1988)."  *Williams v. Limestone County, Ala.*, 198 F[. App'x] 893,
> 897 (11th Cir. 2006).

*Cameron v. Allen*, 525 F. Supp. 2d 1302, 1307 (M.D. Ala. 2007).

To the extent McClenton seeks relief from defendants Thomas, Jones and Nettles due to their positions as correctional officials for the treatment furnished to him by medical personnel, assuming *arguendo* the aforementioned defendants exerted some authority over the manner in which those persons responsible for the provision of medical treatment rendered such treatment, the law is well settled "that Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior* [or vicarious liability]." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S.Ct. 1937, 1948 (2009) (citing *Robertson v. Sichel*, 127 U.S. 507, 515-16 (1888) ("A public officer or agent is not responsible for the misfeasances or position wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties")).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft*, 556 U.S. at 676; *Cottone v. Jenne*, 326 F.3d

1352, 1360 (11th Cir. 2003) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1035 (11th Cir. 2001) (A supervisory official "can have no respondeat superior liability for a section 1983 claim."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677. Thus, liability for medical treatment provided to McClenton could attach to defendants Forniss and Thomas only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions . . . and the alleged constitutional deprivation." *Cottone*, 326 F.3d at 1360.

McClenton, however, has presented no evidence, nor can the court countenance the existence of any evidence, which would create a genuine issue of disputed fact with respect to the claim of deliberate indifference by defendants Thomas, Jones, and Nettles. The record is devoid of evidence indicating that these defendants personally participated in or had any involvement, direct or otherwise, with the medical treatment provided to McClenton; rather, it is undisputed that Thomas, Jones, and Nettles did not participate in the provision of treatment to McClenton. The evidentiary materials before the court demonstrate that medical personnel

13

made all decisions relative to the course of treatment provided to McClenton and that they provided treatment to McClenton in accordance with their professional judgment upon assessment of his condition.

In light of the foregoing, defendants Thomas, Jones, and Nettles can be held liable for decisions of medical personnel only if their actions bear a causal relationship to the purported violation of McClenton's constitutional rights. To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of defendants Thomas, Jones, and Nettles, McClenton must present sufficient evidence which would be admissible at trial of either "a history of widespread abuse [that] put[] [the defendant] on notice of the need to correct the alleged deprivation, and [he] fail[ed] to do so" or "a . . . custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or . . . facts [that] support an inference that [Forniss] directed the [facility's health care staff] to act unlawfully, or knew that [the staff] would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted). A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates that McClenton has failed to meet this burden.

The record before the court contains no probative evidence to support an inference that Thomas, Jones, or Nettles directed medical personnel to act unlawfully or knew that they would act/acted unlawfully and failed to stop such action. In addition, McClenton has presented no evidence of obvious, flagrant or rampant abuse of continuing duration in the face of which the defendants failed to take corrective action; instead, the undisputed medical records indicate that McClenton had continuous access to medical personnel and received treatment for his condition.

14

Finally, the undisputed medical records demonstrate that the challenged course of medical treatment did not occur pursuant to a policy enacted by the correctional defendants. Thus, the requisite causal connection does not exist in this case and liability under the custom or policy standard is not warranted. *Cf. Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990); *Turner v. Safely*, 482 U.S. 78 (1987). Summary judgment is therefore due to be granted in favor of defendants Thomas, Jones, and Nettles. Furthermore, even had McClenton presented a proper basis for the claims lodged against these defendants, the medical records before the court indicate that health care personnel did not act with deliberate indifference to McClenton's medical needs.

### C.  Deliberate Indifference by Medical Personnel

McClenton asserts that beginning in February of 2011 and continuing until the time he filed this complaint in July of 2011 medical personnel at Bullock ignored his complaints regarding a defibrillator malfunction and failed to provide him adequate treatment for his hernia condition. *Compl. - Doc. No. 1* at 2-3. The medical defendants adamantly deny they acted with deliberate indifference to McClenton's medical needs. In support of this assertion, the defendants maintain they provided medical treatment to McClenton in accordance with their professional judgment, including issuance of medical profiles to permit limited activity and provide access to both a walking cane and wheelchair, issuance of prescriptions for medication to alleviate his pain, scheduling McClenton appointments with a free-world cardiologist for evaluation of complications associated with the defibrillator and referral to a free-world surgeon for surgical repair of his bilateral hernia.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an

15

inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986). Specifically, medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106; *Adams v. Poag*, 61 F.3d 1537, 1546 (11th Cir. 1995) (citation and internal quotations omitted) (As directed by *Estelle*, a plaintiff must establish "not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat or a delay in [the acknowledged necessary] treatment."

> That medical malpractice-negligence by a physician-is insufficient to form the basis of a claim for deliberate indifference is well settled. *See Estelle v. Gamble*, 429 U.S. 97, 105-07, 97 S. Ct. 285, 292, 50 L. Ed. 2d 251 (1976); *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995). Instead, something more must be shown. Evidence must support a conclusion that a prison physician's harmful acts were intentional or reckless. *See Farmer v. Brennan*, 511 U.S. 825, 833-38, 114 S. Ct. 1970, 1977-79, 128 L. Ed. 2d 811 (1994); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (stating that deliberate indifference is equivalent of recklessly disregarding substantial risk of serious harm to inmate); *Adams*, 61 F.3d at 1543 (stating that plaintiff must show more than mere negligence to assert an Eighth Amendment violation); *Hill v. Dekalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1191 n.28 (11th Cir. 1994) (recognizing that Supreme Court has defined "deliberate indifference" as requiring more than mere negligence and has adopted a "subjective recklessness" standard from criminal law); *Qian v. Kautz*, 168 F.3d 949, 955 (7th Cir. 1999) (stating "deliberate indifference" is synonym for intentional or reckless conduct, and that "reckless" conduct describes conduct so dangerous that deliberate nature can be inferred).

*Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir. 1999).

In order to properly establish "deliberate indifference to [a] serious medical need . . . ,

16

Plaintiff[] must show:  (1) a serious medical need; (2) the defendants' deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306-07 (11th Cir. 2009).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious condition, not just knowledge of symptoms, and ignore known risk to serious condition to warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate indifference, . . . the Supreme Court has . . . emphasized that not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.' *Estelle*, 429 U.S. at 105, 97 S. Ct. at 291; *Mandel*, 888 F.2d at 787.  Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or malpractice do not rise to the level of constitutional violations.  *See Estelle*, 429 U.S. at 106, 97 S. Ct. at 292 ('Medical

17

> malpractice does not become a constitutional violation merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient' to constitute deliberate indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not constitute deliberate indifference). Nor does a simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment support a claim of cruel and unusual punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor*, 221 F.3d at 1258 (citation and internal quotations omitted) (To show deliberate indifference to a serious medical need, a plaintiff must demonstrate that [the] defendants' response to the need was more than "merely accidental inadequacy, negligence in diagnosis or treatment, or even medical malpractice actionable under state law."). Moreover, "as *Estelle* teaches, whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams*, 61 F.3d at 1545; *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb Cnty.*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir.

18

1990).

The affidavits filed by the medical defendants address the claims made by McClenton alleging a lack of adequate medical treatment.  A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with treatment provided to McClenton relative to the instant claims of deliberate indifference.  Dr. Siddiq addresses McClenton's allegations, in pertinent part, as follows:

As evident from Mr. McClenton's medical records, Mr. McClenton has been diagnosed with a long list of chronic medical conditions, including diabetes, hyperlipidemia, chronic constructive pulmonary disease and hypertension.  Mr. McClenton has relied upon a defibrillator implanted in his chest since approximately May of 2005.  It should be noted that a defibrillator is *not* a pacemaker.  In layman's terms, a defibrillator is intended to shock the heart in the event that the heart ceases to function, while a pacemaker ensures that the heart continues to function in a particular manner.  Mr. McClenton also has a history of colon cancer and colon polyps with a possible previous colon restriction.  Because of his medical condition, Mr. McClenton has been on medical hold since as early as October 14, 2010.

Mr. McClenton began relying upon a walking cane as early as September of 2009.  Thus, Mr. McClenton's limited mobility and his use of a walking cane existed long before any of the medical conditions listed in his Complaint in this case, as evident from the fact that he received a "profile" for a walking cane as early as March of 2010.  A profile is simply a physician's order which permits an inmate to utilize approved medical devices and otherwise deviate from the standard operating procedures and protocols [for inmate activity] established by the Alabama Department of Corrections.

Prior to his incarceration at Bullock, Mr. McClenton initially developed an inguinal hernia in approximately 2005 [while not confined in the prison system].  I understand from communications from Mr. McClenton that his inguinal hernia was evaluated by a physician at Huntsville Hospital in Huntsville, Alabama during this time frame.  According to Mr. McClenton, he refused to undergo a procedure for the surgical repair of his hernia at that time.  Therefore, Mr. McClenton did exhibit a small inguinal hernia at the time of his arrival at

Bullock.

Throughout the Fall of 2010, the Bullock medical staff routinely saw Mr. McClenton regarding all of his complaints and concerns related to his medical condition. Mr. McClenton complained of some discomfort in his chest as a result of his defibrillator and [submitted] a sick-call request form dated October 17, 2010. Mr. McClenton was evaluated during sick call on October 19, 2010, at which time he complained of pain in his shoulder. However, the exact nature of his concerns were unclear at that time as his complaints were possibly related to some muscular strain as opposed to some issue with his defibrillator.

Mr. McClenton complained of constipation in a November 1, 2010 sick-call request form. But, Mr. McClenton failed to appear for sick call [regarding this complaint] on November 3, 2010.

Mr. McClenton complained of pain in his right side in a sick-call request form dated November 13, 2010, and was evaluated later that day by the medical staff who noted that the discomfort appeared to be associated with the inguinal hernia. As indicated in the records from [McClenton's examination by medical personnel], Mr. McClenton's hernia was small at the time and was reducible not indicating any need for further evaluation or intervention. Mr. McClenton failed [to] appear for another evaluation on November 15, 2010.

Mr. McClenton underwent an evaluation of his defibrillator by an off-site cardiology specialist on November 17, 2010, at which time the outside specialist indicated that there were no changes necessary to his device at that time. Following the November 17, 2010 evaluation of McClenton's defibrillator, he was instructed to return to the off-site specialist in approximately three months for further evaluation.

Mr. McClenton submitted a sick-call request form dated December 11, 2010, requesting a support [harness] for his hernia. Mr. McClenton was evaluated by the medical staff during sick call on December 12, 2010 at which time it was evident that his hernia was increasing in size and he was instructed to utilize his hernia support or "truss" to maintain the position of the hernia in hopes that the hernia might resolve itself without surgical intervention.

Mr. McClenton was evaluated again during sick call on January 13, 2011, relative to complaints regarding his hernia. At that time, McClenton complained of pain in his side. The medical staff moved Mr. McClenton to the infirmary at Bullock where he remained until he was evaluated by me later that afternoon.

Upon an evaluation of Mr. McClenton on January 13, 2011, I noted the small inguinal hernia on his right side which was easily reducible and Mr. McClenton only reported slight pain. Following the January 13, 2011, evaluation, I indicated to Mr. McClenton that we would evaluate him for possible surgical repair of his hernia. I subsequently ordered Mr. McClenton to continue the use of a hernia support or "truss" to support [his hernia] and otherwise avoid any

complications with his hernia.

I then completed the necessary paperwork to refer Mr. McClenton to an offsite specialist for surgical evaluation of his hernia. Mr. McClenton attended an appointment with an off-site surgeon on January 18, 2011 for evaluation of his inguinal hernia. As indicated in the notes from the surgical specialist that evaluated Mr. McClenton's hernia, the surgeon expressed concern that the hernia repair should not be completed until "after [] defibrillator addressed."

When Mr. McClenton was evaluated by me on January 29, 2011, he did not mention any complaints related to his defibrillator [but only referenced] complaints of chest congestion and cold symptoms.

When I evaluated Mr. McClenton the very next day, Mr. McClenton complained that his defibrillator had fired approximately three times over the past 24 hours. Following my evaluation of Mr. McClenton, I ordered certain lab work and testing, including an EKG and informed Mr. McClenton that we would refer him to a cardiologist if his defibrillator fired again. On January 31, 2011, Mr. McClenton refused to undergo a chest x-ray as ordered by me.

[Upon referral by the medical staff at Bullock], Mr. McClenton attended an appointment with a cardiologist at River Regional Cardiology Associates in Montgomery, Alabama on February 3, 2011. As indicated in the notes from . . . Dr. Mohammad L. Ahmed, a cardiologist with River Regional Cardiology Associates, I was in regular consultation with [Dr. Ahmed] as soon as we realized the complaints from Mr. McClenton related to his defibrillator. As indicated in these notes, Mr. McClenton had demonstrated normal lab results and normal heart rhythm. During the course of the evaluation [by Dr. Ahmed], there was a discussion with Mr. McClenton relative to his wishes as to the device and Mr. McClenton voiced his request that the current defibrillator be removed and replaced. Dr. Ahmed confirmed [that] during the course of the evaluation on February 3, 2011, that Mr. McClenton's defibrillator was dysfunctional in certain respects and required turning off, which was accomplished during the appointment.

Upon his return [to Bullock], I conducted an evaluation of Mr. McClenton and [despite deactivation of the defibrillator during his appointment with the cardiologist] he reported to me that his defibrillator had fired again. He also reported tenderness at the site of his defibrillator. Therefore, following this February 3, 2011, evaluation, I immediately completed the necessary paperwork to continue to pursue Mr. McClenton's continued care with the off-site cardiologist, including the possible removal of his defibrillator. The following day, February 4, 2011, Mr. McClenton [again] reported the firing of his defibrillator. . . .

On February 10, 2011, CMS's associate regional medical director approved the replacement of the defibrillator consistent with Mr. McClenton's

wishes.  On February 8, 2011, I received a letter from Dr. John Vermillion from the Montgomery Surgical Specialists who had previously evaluated Mr. McClenton [regarding possible surgical repair of his hernia].  In this letter, Dr. Vermillion confirmed his recommendation that we "address [Mr. McClenton's] cardiac situation first and take care of the defibrillator before we proceed with surgery on his inguinal hernia."

On February 15, 2011, I completed the necessary documentation to proceed with the evaluation of Mr. McClenton's medical condition to evaluate the current status of Mr. McClenton's cardiac function.  This . . . evaluation was subsequently scheduled for March 2, 2011 at 11:00 a.m. at Dr. Ahmed's office in Montgomery, Alabama.

Mr. McClenton was evaluated by the medical staff [at Bullock] on February 24, 2011, at which time they evaluated his condition and his request for a new truss as well as additional profiles, though his current truss was performing appropriately.

Mr. McClenton was evaluated by the medical staff during sick call on March 2,2011, at which time he was provided a profile for a tub bath and referred to me for further evaluation.  Between March 2, 2011 and the present date [August 29, 2011], the medical staff continued to evaluate Mr. McClenton's complaints on each occasion that he submitted a sick-call request form.  However, Mr. McClenton continued to fail to appear for sick call on many occasions when he submitted a sick call request form.  Throughout February and March of 2011, I also evaluated Mr. McClenton on two occasions during which we discussed his continuing issues with his defibrillator and his consultation with a cardiologist. On February 24, 2011, Mr. McClenton complained of pain in his hernia and his groin and requested pain medication and received medication for these complaints.

For reasons unknown to the medical staff, Mr. McClenton was unable to keep his March 2, 2011, appointment for pre-surgical evaluation at Dr. Ahmed's office.  After being notified of this scheduling issue, Mr. McClenton was subsequently scheduled for another appointment with Dr. Ahmed for March 23, 2011.  Mr. McClenton underwent a stress test on March 23, 2011.  As indicated through this testing, the stress test undertaken by Mr. McClenton did indicate the stability of his current cardiac function without assistance of a defibrillator. According to the notes from the March 2[3], 2011 evaluation by Dr. Ahmed, Dr. Ahmed indicated that he recommended extended discussions with medical personnel at the University of Alabama [Hospital] in Birmingham relative to the explantation of the device and also instructed the medical staff to have Mr. McClenton return for a follow-up at approximately one month to "determine the need for new [defibrillator]."

Upon his return from this appointment [with Dr. Ahmed], I entered orders

22

to arrange defibrillator replacement.  I also entered orders for Mr. McClenton to return for another evaluation at Dr. Ahmed's office on April 12, 2011 at 10:00 a.m.

As of April 5, 2011, Mr. McClenton did not voice any complaints to me during his appointment regarding his hernia or his defibrillator.

Mr. McClenton returned for another appointment with the off-site cardiologist on April 12, 2011.  During the April 12, 2011, appointment with Dr. Ahmed, Mr. McClenton and Dr. Ahmed discussed the process for explantation of his defibrillator device which would require one procedure to remove the device, an interim evaluation to determine the necessity of implantation of a new device, and if appropriate, another surgical procedure to implant a new device.  As soon as we received the recommendation from Dr. Ahmed in April of 2011, we immediately began attempting to schedule the explantation procedure for Mr. McClenton at UAB.  However, we were unable to obtain an appointment for this procedure prior to July 5, 2011.  The request for explantation of the defibrillator was approved by the associate regional medical director on June 13, 2011.

In an order dated June 27, 2011, I ordered Mr. McClenton to attend an interim consultation with the medical staff at the University of Alabama in Birmingham ("UAB") while he awaited the procedure for explantation of his defibrillator.  On July 5, 2011, Mr. McClenton attended an appointment with a cardiologist at UAB.  As indicated in the documentation completed both by the UAB cardiac surgeon and medical personnel [at Bullock] upon Mr. McClenton's return to the facility, Mr. McClenton was informed of the process for explantation of his device and he "chose to leave it in."  In particular, Mr. McClenton was informed by the UAB cardiologist of the significant risks and concerns related to the removal of the device, including uncontrollable bleeding.  Mr. McClenton was also made aware at that time that his defibrillator could remain implanted in his chest without any meaningful harm to him.  As indicated in my review of the off-site consultant report and the "return from offsite" form, I noted that there would be "***no need for any other procedure***" after this appointment and that we would follow-up with Mr. McClenton [at Bullock] as of July 5, 2011.  On July 14, 2011, I received approval to continue to refer Mr. McClenton to Dr. Ahmed for continuing evaluations of his cardiac function.

I evaluated Mr. McClenton on July 7, 2011, at which time he indicated that his hernia was creating additional problems in his mobility and therefore, I ordered that he receive a wheelchair.  I next evaluated Mr. McClenton on July 15, 2011, relative to his complaints regarding his inguinal hernia.  During my course of interaction with Mr. McClenton on July 15, 2011, I also attempted to discuss his defibrillator situation with him, but Mr. McClenton refused to engage in any discussion with me.  As indicated in my notes from the July 15, 2011, evaluation,

I informed Mr. McClenton that we would be pursuing surgical options for his hernia given the recent resolution of his issues with his defibrillator. In summary, the final decision relative to Mr. McClenton's defibrillator was the result of his consultation with an off-site cardiologist and I was not involved in any way with the decision to forego explantation of the defibrillator device.

On August 11, 2011, Mr. McClenton attended the follow-up appointment with Dr. Ahmed who cleared him for surgical repair of his hernia and instructed Mr. McClenton to follow-up with him 3 months after his hernia repair. Having now obtained approval for this procedure, we are in the process of scheduling the surgical repair procedure. However, due to security protocols, I cannot disclose the timing or date and time of such surgical procedure.

Dr. Ahmed instructed [McClenton] to follow-up three months after his pending surgery for his hernia repair. Throughout the course of Mr. McClenton's incarceration, we have entered certain profiles which allowed him to utilize a hernia support and other medical devices to control any discomfort associated with his medical conditions.

Throughout his incarceration at Bullock, Mr. McClenton has also attended the chronic care clinics during which all of his current medical conditions were [consistently] evaluated. Mr. McClenton also underwent regular lab testing to evaluate his diabetic and other chronic medical conditions.

During the time when Mr. McClenton has been under my care, I have not at any time ignored any request by Mr. McClenton for medical treatment. I have not deliberately ignored any medical complaints made by Mr. McClenton or interfered in any way with the provision of medical care to Mr. McClenton at any time. . . . At all times during his incarceration at Bullock, I listened to Mr. McClenton's complaints, undertook thorough physical examinations of him and provided medication when appropriate to control the symptoms which he communicated to me. I can state to a reasonable degree of medical certainty that Mr. McClenton has received an extensive amount of medical attention for his medical complaints.

*Exhibit 1 to the Special Report of the Medical Defendants - Doc. No. 15-1* at 3-11 (internal citations to medical records omitted) (emphasis in original). The medical records demonstrate that McClenton underwent surgical repair of his bilateral hernia at Baptist Hospital South in Montgomery, Alabama on September 12, 2011. *Exhibit 1 to the October 10, 2011 Response of the Medical Defendants - Doc. No. 28* at 6-7. During this procedure, Dr. Vermillion repaired

both the left and right inguinal hernias.  *Id*.

Under the circumstances of this case, the court concludes that the course of treatment undertaken by the medical defendants in addressing McClenton's complaints regarding his defibrillator and hernia did not violate his constitutional rights.  The medical care McClenton received was certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness."  *Harris*, 941 F.2d at 1505.  The allegations presented by McClenton simply fail to establish deliberate indifference by the defendants.  *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545-46 (Whether medical personnel "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis" on which to ground constitutional liability.  In addition, an inmate's allegation that prison physicians did not diligently pursue alternative means of treating condition "did not 'rise beyond negligence'. . . to the level of deliberate indifference."); *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).

It is undisputed that McClenton received treatment with respect to the deficient performance of his defibrillator and for his bilateral hernia.  It is likewise evident that the defendants rendered treatment to McClenton in accordance with their professional judgment and pursuant to the recommendations of free-world specialists to whom McClenton was referred for

evaluation of both his cardiac function and hernia condition.  Moreover, McClenton has failed to present any evidence which indicates the medical defendants knew that the manner in which they provided treatment created a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is therefore devoid of evidence, significantly probative or otherwise, showing that the medical defendants acted with deliberate indifference to McClenton's medical needs.  Consequently, summary judgment is due to be granted in favor of CMS, Dr. Siddiq, and Nurse Nalls.  *Carter*, 352 F.3d at 1350.

### IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  No costs be taxed herein.

It is further

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before **September 3, 2014**.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); s*ee Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); s*ee also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 20th day of August, 2014.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE